MARK D. AND JENNIFER L. SUMMITT, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 13893–07.                Filed May 20, 2010.

P–H is a 10-percent shareholder in S, an S corporation. On Sept. 23, 2002, S paid premiums to acquire two major foreign currency options from B and received premiums when it sold two written minor foreign currency options to B. The purchased major foreign currency options were a reciprocal put and call, exactly offsetting each other. The written minor foreign currency options also were a reciprocal put and call, exactly offsetting each other. On Sept. 25, 2002, S assigned the major foreign currency call option and the minor foreign currency call option to a charity pursuant to an assignment agreement in which the charity was substituted for S with respect to all obligations under the minor foreign currency call option. R filed a motion for partial summary judgment seeking a determination (1) that S did not recognize loss under sec. 1256, I.R.C., upon its assignment of the major foreign currency call option to charity, and (2) that S must recognize gain upon its assignment of the minor currency call option to charity. Ps contend (1) that the major foreign currency call option assigned to the charity is a sec. 1256, I.R.C., foreign currency contract so that loss, if any, on the assignment of that option was recognized by S in 2002 under the marked-to-market rules of sec. 1256(a) and (c), I.R.C., and (2) that gain, if any, on the assignment of the minor foreign currency call option to the charity was not recognized by S because the minor foreign currency option was not a sec. 1256, I.R.C., contract and the assignment by S to the charity did not terminate the option. *Held*: Under sec. 1256, I.R.C., the major foreign currency call option is not a foreign currency contract as defined in sec. 1256(b)(2) and (g)(2), I.R.C., and the marked-to-market provisions of sec. 1256, I.R.C., do not apply to enable S to recognize the loss on the assignment of the major foreign currency option to the charity. *Held*, *further*, there are genuine issues of material fact remaining with respect to the income tax treatment of the assignment of the minor foreign currency call option to the charity that require trial.

*John E. Rogers* and *Colin C. Laitner*, for petitioners.
*John Comeau* and *Jeffrey Dorfman*, for respondent.

OPINION

HAINES, *Judge*: This case is before the Court on respondent's motion for partial summary judgment pursuant to Rule 121.[1] Respondent raises two issues for decision in his motion: (1) Whether under the marked-to-market rules of section 1256 J. Summitt, Inc. (Summitt), an S corporation, recognized loss upon its assignment to charity of a major foreign currency call option, and (2) whether Summitt was required to include in its income, upon its assignment to charity of a minor foreign currency call option, the premium it received as writer of that option.

The following facts are based upon the parties' pleadings, affidavits, and exhibits in support of and in opposition to the motion for partial summary judgment. They are stated solely for the purpose of deciding the motion and not as findings of fact in this case. See Fed. R. Civ. P. 52(a).

*Background*

The loss petitioners claim came from Summitt's offsetting foreign currency option transactions, the income tax effects of which flowed through to petitioners' joint 2002 Federal income tax return. Summitt is a California corporation with its principal place of business in San Clemente. Summitt was incorporated on March 25, 1996, and elected on April 1, 1997, to be treated as an S corporation under section 1361(a)(1). Petitioner Mark D. Summitt (petitioner) is a 10-percent shareholder in Summitt. Petitioners resided in Monrovia, California, at the time the petition was filed.

During 2002 Summitt engaged Multi National Strategies, LLC (Multi National), located in New York City, to provide advice with respect to foreign currency option transactions and to serve as depositary for funds needed for the transactions. On September 10, 2002, Summitt entered into agreements with Beckenham Trading Co., Inc. (Beckenham), with its principal place of business in Fort Lee, New Jersey, to

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code (Code), as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure. Amounts are rounded to the nearest dollar.

engage in cross-currency transactions. The agreements between Beckenham and Summitt recited that the transactions were intended to be exempt from, and otherwise not subject to, regulation under the Commodity Exchange Act. Beckenham was designated the calculation agent for the transactions to determine all amounts due to or from each party in accordance with terms specified in the agreements with Summitt.

On September 21, 2002, Summitt authorized Multi National to purchase two 180-day major foreign currency options[2] and to sell on behalf of Summitt two 180-day written minor foreign currency options.[3] On September 23, 2002, Summitt purchased from Beckenham two major currency options, each pegged to the U.S. dollar (USD) and the European Union euro (EUR). The major currency options were a reciprocal put and call, exactly offsetting each other. The purchased major options moved inversely in value to one another over the 180-day period, thus ensuring that Summitt would hold a loss position in one of the two purchased options. The EUR call option (3032) and the EUR put option (3033) had a notional value of EUR 357,580,711, a strike price of $0.9788 USD/EUR, and an expiration date of March 21, 2003.[4]

The party obligated to perform if the holder exercises the option is the writer of the option. Beckenham was the writer of the major currency options and obligated itself to perform at the discretion of Summitt. As the purchaser and holder of the major currency call option, Summitt, by exercising the option, could require Beckenham to deliver the euro at a price of $0.9788 USD/EUR. As the purchaser and holder of the put option, Summitt, by exercising the option, could require Beckenham to take delivery of the euro at a future date or dates at a price of $0.9788 USD/EUR. The price specified in

---

[2] A major foreign currency is a "currency in which positions are * * * traded through regulated futures contracts". Sec. 1256(g)(2)(A)(i). The term "regulated futures contract", as defined in sec. 1256(g)(1), means "a contract—(A) with respect to which the amount required to be deposited and the amount which may be withdrawn depends on a system of marking to market, and (B) which is traded on or subject to the rules of a qualified board or exchange." Major currencies include the U.S. dollar, British pound, Japanese yen, Swiss franc, and European Union euro.

[3] Minor currencies include the Danish krone.

[4] The numbers in parentheses are trade references used to identify the various option transactions.

the contract at which the euro would be purchased pursuant to exercise of the put or call option is the strike price.

On the same day that Summitt purchased the major currency options, Summitt wrote and sold to Beckenham two minor currency options, each pegged to the USD and the Danish krone (DKK). The written minor currency options were a reciprocal put and call, exactly offsetting each other. The written minor options moved inversely in value to one another over the 180-day period, thus ensuring that Summitt would hold a gain position in one of the two minor currency options. The DKK call option (3034) and the DKK put option (3035) had a notional value of DKK 2,661,225,000 with a strike price of 7.6035 DKK/USD and a bonus payout of DKK 10,162,040 if the DKK/USD strike price was greater than 7.2586 DKK. The expiration date for both minor currency options was March 21, 2003.

Summitt, the writer of the minor currency options, obligated itself to perform at the discretion of Beckenham. As the purchaser and holder of the minor currency call option, Beckenham, by exercising the option, could require Summitt to deliver Danish kroner at a price of 7.6035 DKK/USD. As the purchaser and holder of the put option, Beckenham, by exercising the option, could require Summitt to take delivery of kroner at a future date or dates at a price of 7.6035 DKK/USD.

The values of the two foreign currencies underlying the purchased major and written minor options historically have demonstrated a very high positive correlation with each other. As the currencies change in value because of exchange rate fluctuations, Summitt could reasonably expect to have the following potential gains and losses in substantially offsetting positions: (1) A loss in a purchased major option and a gain in a written minor option, and (2) a gain in a purchased major option and a loss in a written minor option. At any time, Summitt's loss in the purchased major option that had declined in value might be more or less than Summitt's gain in the offsetting written minor option that had appreciated in value. Similarly, Summitt's gain in the remaining purchased major option might be more or less than Summitt's loss in the remaining written minor option.

The premiums Beckenham charged for the major currency options totaled $19,967,500, consisting of a $9,983,750 premium for the EUR call option (3032) and a $9,983,750

premium for the EUR put option (3033). The premiums charged by Summitt for the minor currency options totaled $19,950,000, consisting of a $9,975,000 premium for the DKK call option (3034) and a $9,975,000 premium for the DKK put option (3035). The net premium paid by Summitt in respect of the two major and two minor options was $17,500.[5]

Two days later, on September 25, 2002, Summitt assigned to the Foundation for Educated America, Inc. (charity), the EUR call option (3032) and the DKK call option (3034).[6] At the time of the assignment, the potential loss on the EUR call option (3032) was $1,750,535, and the potential gain on the DKK call option (3034) was $1,745,285. On December 12, 2002, Summitt closed out the EUR put option (3033) and the DKK put option (3035) by agreeing with Beckenham to offset those options against each other.

In 2003 Summitt filed a Form 1120S, U.S. Income Tax Return for an S Corporation, for 2002 (original return) reporting gross receipts of $21,258,592 less $18,739,492 cost of goods sold, resulting in a gross profit of $2,519,100. Summitt also reported the following currency transactions on Statement 6 attached to the return:

---

[5] Total premiums of $19,967,500 charged for the two major currency options less total premiums received of $19,950,000 for the two minor currency options.

[6] Schedule A to the assignment agreement, corporate minutes, and correspondence all designate Sept. 25, 2002, as the effective date.

| Option | Property description | Trade | Date acquired | Trade | Date sold | Gross sale price[1] | Cost or other basis[2] | Gain/loss |
|---|---|---|---|---|---|---|---|---|
| EUR Call | EUR 357,580,711 | 3032 | 9/23/02 | 3040 | [3]12/12/02 | $8,233,215 | [4]$9,992,500 | ($1,759,285) |
| EUR Put | EUR 357,580,711 | 3033 | 9/23/02 | 3041 | [5]9/25/02 | 11,724,660 | 9,983,750 | 1,740,910 |
| DKK Put | DKK 2,661,225,000 | 3035 | 9/23/02 | 3043 | 12/12/02 | 9,975,000 | 11,720,285 | (1,745,285) |
| - - - | AUD 80,594,595 | - - - | 11/6/02 | - - - | 11/6/02 | 868,084 | 870,584 | (2,500) |
| - - - | AUD 80,594,595 | - - - | 11/8/02 | - - - | 11/8/02 | 1,332,625 | 1,329,514 | 3,111 |
| - - - | EUR 37,500,000 | - - - | 12/11/02 | - - - | 12/11/02 | 480,636 | 483,136 | (2,500) |
| - - - | EUR 37,500,000 | - - - | 12/12/02 | - - - | 12/12/02 | 583,748 | 580,998 | 2,750 |
| - - - | AUD 60,000,000 | - - - | 12/26/02 | - - - | 12/26/02 | 531,768 | 533,768 | (2,000) |
| - - - | AUD 60,000,000 | - - - | 12/31/02 | - - - | 12/31/02 | 308,539 | 306,689 | 1,850 |
| Total | | | | | | | | (1,762,949) |

[1] The gross sale price for each minor option was the premium paid by Beckenham to Summitt, writer of the options. The gross sale price for each major option was determined by Beckenham.

[2] The cost or other basis for each major option was the premium paid by Summitt to Beckenham. The cost for each minor option was determined by Beckenham.

[3] Note the mistake in dates on the first two trades listed. The first trade listed is option 3032, and the second is option 3033. The return transposes the dates transferred/closed: 3032 was transferred on Sept. 25, 2002, and 3033 was closed on Dec. 12, 2002.

[4] Note that the amount reported on the return is $9,992,500. The premium was $9,983,750, and the $8,750 difference is unexplained.

[5] The date should be Dec. 12, 2002, per n.3 to above Statement 6.

Summitt did not report gain from the disposition of the DKK call option (3034) on its original return. The $1,762,949 loss from Statement 6 was subtracted from gross profit of $2,519,100 to arrive at total income of $756,151. Business deductions of $691,424 were claimed, resulting in ordinary income of $64,727. As a 10-percent shareholder of Summitt, petitioner reported $6,473 ordinary income from Summitt on his timely filed joint Form 1040, U.S. Individual Income Tax Return, for 2002.

Summitt filed a first amended Form 1120S for 2002 (first amended return) on January 8, 2004, reporting the same gross receipts, cost of goods sold, and gross profit shown on the original return. However, Summitt amended the currency transactions reported on Statement 6 attached to the return by adding the following entry to report the gain on the DKK call option (3034):

| Option | Property description | Trade | Date acquired | Trade | Date sold | Gross sale price | Cost or other basis | Gain/loss |
|---|---|---|---|---|---|---|---|---|
| DKK call | DKK 2,661,225,000 | 3034 | 9/23/02 | 3042 | 9/25/02 | $9,975,000 | $8,229,715 | $1,745,285 |

By reporting the gain of $1,745,285 from the disposition of the DKK call option (3034), the $1,762,949 loss reported on the original return was reduced to $17,664 on the first amended return. As a result, rather than reducing gross profit of $2,519,100 by $1,762,949, gross profit was reduced by $17,664 on the first amended return resulting in total income of $2,501,436. Subtracting the claimed business deductions of $691,424, unchanged from the original return, resulted in reported ordinary income of $1,810,012.

On January 9, 2004, petitioners filed a first amended return for 2002 on which they increased their flow-through income from Summitt to $181,001. Petitioners' first amended return reported an additional tax due of $64,779. The Internal Revenue Service (IRS) assessed this additional tax and on April 5, 2004, petitioners paid the tax, including interest, in the total amount of $67,432.

On February 14, 2007, Summitt attempted to file a second amended return for 2002, which reinstated its position that the receipt of a premium on the DKK call option (3034) was not taxable. The second amended return was a restatement of the original return. Petitioners also attempted to file a

second amended return for 2002 to be consistent with Summitt's second amended return. Neither of the second amended returns was accepted by the IRS.

On March 15, 2007, respondent issued a notice of deficiency to petitioners for 2002 which disallowed a $1,767 flow-through loss from Summitt's foreign currency option transactions disclosed on the first amended return.[7] On June 12, 2007, petitioners mailed a petition to this Court.[8] In their petition, petitioners disavowed portions of their first amended return and asserted that their share of the $9,975,000 premium Summitt received for the sale of the DKK call option (3034) option was not includable in 2002 income.

On February 9, 2009, respondent filed the motion for partial summary judgment seeking determinations (1) that the marked-to-market rules of section 1256 do not apply to the EUR call option (3032), and (2) that Summitt must include in income in 2002 the premium received upon the issuance of the DKK call option (3034) because the assignment of the option to charity caused a novation. Petitioners filed an objection to the motion on March 19, 2009. Respondent filed a reply on April 27, 2009, and a supplemental memorandum on May 20, 2009. The Court held a hearing on the motion on June 10, 2009. Posthearing memoranda were received from petitioner and respondent on August 7 and September 24, 2009, respectively.

## *Discussion*

### I. *Procedure*

Summary judgment is intended to expedite litigation and avoid unnecessary and expensive trials. *Fla. Peach Corp. v. Commissioner*, 90 T.C. 678, 681 (1988). The Court may grant summary judgment when there is no genuine issue of material fact and a decision may be rendered as a matter of law. Rule 121(b); *Sundstrand Corp. v. Commissioner*, 98 T.C. 518, 520 (1992), affd. 17 F.3d 965 (7th Cir. 1994); *Zaentz v. Commissioner*, 90 T.C. 753, 754 (1988). The moving party

---

[7] Petitioners executed a Form 872, Consent to Extend the Time to Assess Tax, extending the time to assess for 2002 to Apr. 15, 2007.

[8] The Court received the petition on June 18, 2007, but the petition was postmarked and deemed filed on June 12, 2007.

bears the burden of proving that there is no genuine issue of material fact. *Dahlstrom v. Commissioner*, 85 T.C. 812, 821 (1985); *Naftel v. Commissioner*, 85 T.C. 527, 529 (1985). The Court will view any factual material and inferences in the light most favorable to the nonmoving party. *Dahlstrom v. Commissioner*, *supra* at 821; *Naftel v. Commissioner*, *supra* at 529.

After reviewing the record, we are satisfied that there is no genuine issue of any material fact on the section 1256 issue and that a decision may be rendered as a matter of law. Respondent's motion will be granted denying the purported loss on assignment of the major foreign currency call option to charity. On the second issue with respect to purported gain on the assignment of the minor foreign currency call option, there are issues of material fact that require a trial, and respondent's motion will be denied.

## II. *Background*

This is a case of first impression that requires interpretation of the term "foreign currency contract" as defined in section 1256. The term first appeared in the Code in 1982, and, although the Secretary was granted authority in 1982 to issue regulations to determine what types of contracts were included or excluded by the term, no such regulations have been issued. Nor has the term been interpreted by the courts.

As we shall see, section 1256 applies to futures and options contracts that are traded on a qualified exchange. A qualified exchange means a national securities exchange which is registered with the Securities and Exchange Commission, a domestic board of trade designated as a contract market by the Commodity Futures Trading Commission, or any other exchange, board of trade, or other market which the Secretary determines has rules adequate to carry out the purposes of section 1256. Sec. 1256(g)(7).

Section 1256 also covers contracts that are not traded on a qualified exchange; i.e., foreign currency contracts that are negotiated with any one of a number of commercial banks which provide an informal market for such trading. The issue before us is whether a major foreign currency call option, a non-exchange-traded contract, comes within the meaning of "foreign currency contract" so as to qualify for section 1256

treatment. Petitioners argue that the plain meaning of the definition of "foreign currency contract" in section 1256 should be interpreted broadly to include a major foreign currency option. Respondent argues that the plain meaning of that definition should be interpreted narrowly to include only a forward contract, not an option.

The issue arises in the context of what are sometimes known as "major/minor" transactions. In the typical major/minor transaction, the taxpayer assigns to a charity[9] a major foreign currency call option that has a potential loss. The charity also assumes the taxpayer's obligation under the offsetting minor foreign currency call option that has a potential gain.

Because the taxpayer takes the position that the major foreign currency call option assigned to the charity is a section 1256 foreign currency contract, the taxpayer relies on section 1256(c) and *Greene v. United States*, 79 F.3d 1348 (2d Cir. 1996), to mark to market the major foreign currency call option when the option is assigned to the charity in order to recognize a loss at that time.[10] The taxpayer may argue that the loss is characterized as ordinary if the transaction also qualifies as a section 988 transaction.[11]

In contrast, because the taxpayer takes the position that the assumed minor foreign currency call option is not a section 1256 foreign currency contract, the taxpayer claims that the charity's assumption of the written minor obligation does not cause the taxpayer to recognize gain and that the taxpayer also does not recognize gain when the option either expires or terminates.

III. *Section 1256*

When Congress enacted section 1256 as part of the Economic Recovery Tax Act of 1981 (ERTA), Pub. L. 97–34, sec. 503(a), 95 Stat. 327, the section applied only to regulated futures contracts that required physical delivery of personal

---

[9] A charity is an organization defined in sec. 170(c)(2) contributions to which are deductible for income tax purposes as charitable contributions.

[10] Unlike the present case, *Greene v. United States*, 79 F.3d 1348 (2d Cir. 1996), dealt with transfers of regulated futures contracts to charity. Regulated futures contracts, as will be shown, are sec. 1256 contracts. Sec. 1256(b)(1), (g)(1).

[11] See sec. 988(a)(1)(A) and sec. 1.988–3(a), Income Tax Regs., which override the characterization of capital losses specified in sec. 1256 if sec. 988 also applies.

property. The pertinent parts of section 1256 originally provided:

SEC. 1256. REGULATED FUTURES CONTRACTS MARKED TO
            MARKET.

(a) GENERAL RULE.—For purposes of this subtitle—

(1) each regulated futures contract held by the taxpayer at the close of the taxable year shall be treated as sold for its fair market value on the last business day of such taxable year (and any gain or loss shall be taken into account for the taxable year),

(2) proper adjustment shall be made in the amount of any gain or loss subsequently realized for gain or loss taken into account by reason of paragraph (1),

(3) any gain or loss with respect to a regulated futures contract shall be treated as—

   (A) short-term capital gain or loss, to the extent of 40 percent of such gain or loss, and

   (B) long-term capital gain or loss, to the extent of 60 percent of such gain or loss.

*    *    *    *    *    *    *

(b) REGULATED FUTURES CONTRACTS DEFINED.—For purposes of this section, the term "regulated futures contract" means a contract—

(1) which requires delivery of personal property (as defined in section 1092(d)(1)) or interest in such property;

(2) with respect to which the amount required to be deposited and the amount which may be withdrawn depends on a system of marking to market; and

(3) which is traded on or subject to the rules of a domestic board of trade designated as a contract market by the Commodity Futures Trading Commission or of any board of trade or exchange which the Secretary determines has rules adequate to carry out the purposes of this section.

(c) TERMINATIONS.—The rules of paragraphs (1), (2), and (3) of subsection (a) shall also apply to the termination during the taxable year of the taxpayer's obligation with respect to a regulated futures contract by offsetting, by taking or making delivery, or otherwise. For purposes of the preceding sentence, fair market value at the time of the termination shall be taken into account.

Stevie D. Conlon and Vincent M. Aquilino, in their treatise Principles of Financial Derivatives: U.S. & International Taxation, par. A1.03 (2009) (citing Hull, Options, Futures and Other Derivative Securities 3–5 (2d ed. 1993)), define a futures contract as an agreement to deliver specified commodities or other property at a future date at an agreed price. Futures contracts are standardized agreements,

tradable on regulated exchanges. A key aspect of regulated futures contracts is the margin requirement. In enacting section 1256, Congress concluded that the daily receipt of profits and the daily payment of losses employed by commodity futures exchanges in the United States for determining margin requirements made it appropriate to compute gains and losses for tax purposes under a similar, albeit annual, marked-to-market system of accounting. H. Rept. 97–201, at 157 (1981), 1981–2 C.B. 352, 475. The marked-to-market rule was also applied to futures transactions occurring before December 31 of each year if taxpayers terminated the futures contract before that date. Sec. 1256(c).

The Technical Corrections Act of 1982 (1982 Act), Pub. L. 97–448, sec. 105(c)(5), 96 Stat. 2385, made four significant changes to section 1256 that are pertinent to this case. First, the 1982 Act removed the requirement of physical delivery for futures contracts so that cash-settled futures contracts, newly authorized to trade on futures exchanges by the Commodity Futures Trading Commission, would also qualify for section 1256 treatment. *Id.*

Second, the 1982 Act expanded the phrase "regulated futures contract" by adding "Such term includes any foreign currency contract" at the end of section 1256(b). *Id.* As the House Ways and Means Committee explained:

Trading in foreign currency for future delivery is conducted through regulated futures contracts, and is also conducted through contracts negotiated with any one of a number of commercial banks which comprise an informal market for such trading (bank forward contracts). Bank forward contracts differ from regulated future contracts in that they are private contracts in which the parties remain entitled to performance from each other. They further differ from regulated futures contracts in that they do not call for daily variation margin to reflect market changes, and in that the interbank market has no mechanism for settlement terminating a taxpayer's position prior to the delivery date. Prior to ERTA, taxpayers who used both the futures exchanges and the interbank market to conduct short-term trading in foreign currency were subject to substantially comparable tax treatment for both types of contract. Although bank forward contracts differ from regulated futures contracts, the volume of trading through forward contracts in foreign currency in the interbank market is substantially greater than foreign currency trading on futures exchanges, and prices are readily available. Such contracts are economically comparable to regulated futures contracts in the same currencies and are used interchangeably with regulated futures contracts by traders. [H. Rept. 97–794, at 23 (1982).]

A forward contract is an agreement to deliver a specified commodity or other property at a future date at an agreed price. Conlon & Aquilino, *supra* par. A1.02[2][a][i]. Typically, neither party to a forward contract makes a payment at the time the contract is executed.

Third, 1982 Act sec. 105(c)(5) added subsection (g)(1), a definitional subsection, to flesh out general definitions in section 1256(b). The newly enacted section 1256(g)(1) defined a foreign currency contract to be a contract:

(A) which requires delivery of a foreign currency which is a currency in which positions are also traded through regulated futures contracts,

(B) which is traded in the interbank market, and

(C) which is entered into at arm's length at a price determined by reference to the price in the interbank market.

The requirement of delivery of the foreign currency reflected the fact that "the interbank market has no mechanism for settlement terminating a taxpayer's position prior to the delivery date". H. Rept. 97–794, *supra* at 23.

Fourth, 1982 Act sec. 105(c)(5) granted the Secretary authority to prescribe regulations to determine the types of contracts that could be included in or excluded from the definition of a foreign currency contract in section 1256(g)(2):

(2) REGULATIONS.—The Secretary shall prescribe such regulations as may be necessary or appropriate to carry out the purposes of paragraph (1), including regulations excluding from the application of paragraph (1) any contract (or type of contract) if its application thereto would be inconsistent with such purposes.

As previously stated, no such regulations have ever been issued.

The Deficit Reduction Act of 1984 (DEFRA), Pub. L. 98–369, 98 Stat. 494, made three significant changes pertinent to this case. First, DEFRA sec. 722(a)(2), 98 Stat. 972, amended section 1256(g)(1)(A) by adding the phrase "or the settlement of which depends on the value of" to the definition of a foreign currency contract. The effect of this amendment is in dispute in this case. Section 1256(g)(2)(A), as changed by DEFRA sec. 102(a)(3), defined a foreign currency contract to be a contract—

(i) which requires delivery of, *or the settlement of which depends on the value of*, a foreign currency which is a currency in which positions are also traded through regulated futures contracts,
(ii) which is traded in the interbank market, and
(iii) which is entered into at arm's length at a price determined by reference to the price in the interbank market.
[Emphasis added to highlight amendment.]

Second, DEFRA sec. 102 changed the term "regulated futures contract" to the more general term "section 1256 contract" and reorganized section 1256(b) to identify, in general terms, contracts qualifying as section 1256 contracts.

Third, DEFRA sec. 102(a)(2) and (3) extended section 1256 to cover "any nonequity option", sec. 1256(b)(3), and "any dealer equity option", sec. 1256(b)(4), and added specific definitions for those terms in section 1256(g)(3) through (6) inclusive.

The Consolidated Appropriations Act, 2001, Pub. L. 106–554, app. G, sec. 401(g), 114 Stat. 2763A–649 (2000), added "any dealer securities futures contract" and an option on such a contract as section 1256(b)(5).

After reflecting all amendments, section 1256(b) now provides:

SEC. 1256(b). SECTION 1256 CONTRACT DEFINED.—For purposes of this section, the term "section 1256 contract" means—
    (1) any regulated futures contract,
    (2) any foreign currency contract,
    (3) any nonequity option,
    (4) any dealer equity option, and
    (5) any dealer securities futures contract.

The term "section 1256 contract" shall not include any securities futures contract or option on such a contract unless such contract or option is a dealer securities futures contract.

## IV. *Petitioners' Contentions*

Petitioners contend that under the plain meaning of section 1256(g)(2)(A), as amended in 1984, major foreign currency options are foreign currency contracts subject to the marked-to-market rules of section 1256. To support their position they maintain that section 1256(b)(2) refers to "any foreign currency contract". Therefore, section 1256(g)(2)(A) should be construed broadly because "contract" is an inherently broad term, and an option, by definition, is a unilateral contract. 1 Restatement, Contracts 2d, sec. 25 (1981). They

argue there are no legally significant differences among futures, forwards, and options.

Second, petitioners note that no regulations have been issued by the Secretary since 1982 which would limit the definition of a foreign currency contract, and, in petitioners' view, the application of section 1256 to various types of contracts has been expanded and broadened over time. Petitioners reason that this constant expansion, coupled with the inherently broad original defining term "contract", suggests that where a close call is to be made on this issue, the history favors including major foreign currency options within the meaning of "foreign currency contract".[12]

Third, petitioners maintain that there are no economically significant differences among foreign currency forwards, futures, and options. As petitioners state in their posthearing memorandum:

All of these derivatives accomplish the same economic access to currency risk. They reproduce the economic risks and rewards of holding a particular foreign currency over time. These derivatives only differ in their pricing, timing and payment structure, and thus, can be modified or transformed into one another by entering into other derivatives. For example, an option writer fearing a movement in the underlying security adverse to his position can purchase a future on that security to effectively offset his risk, or he could write a contraindicated option as Petitioners did here.

Fourth, petitioners contend, under the plain meaning of the statute, if the Court finds that (1) an option is a contract; (2) the value of the option depends on the value of the euro; (3) the euro is a major foreign currency traded on the interbank market; and (4) the option was entered into at arm's length and with a price coinciding with the interbank market price for such options, section 1256(g)(2)(A) "compels the conclusion that all major foreign currency derivatives created on the informal interbank market [including the major currency options at issue in this case] should be marked to market".

## V. *Respondent's Contentions*

Respondent contends that under the plain meaning of section 1256 a foreign currency option cannot be a foreign cur-

---

[12] Neither party claims that the major foreign currency options in this case are nonequity options, dealer equity options, listed options, dealer securities futures contracts, or options on such contracts pursuant to sec. 1256(b)(3) through (5) inclusive.

rency contract; i.e., a section 1256 contract. Respondent notes that, as originally enacted in 1982, section 1256(g)(1)(A) referred to a contract that required delivery of a foreign currency. The writer of a forward contract is required to deliver a foreign currency at a future date at an agreed price. On the other hand, respondent points out that, at the time an option is signed, there is no obligation to deliver. An obligation to deliver occurs only if the holder of the option exercises its right to require delivery at some future time after the option has been signed. The obligation to deliver may never occur if the option holder allows the option to lapse. Consequently, respondent argues that, because section 1256(g)(1)(A), as originally enacted, referred to a contract that required delivery of the foreign currency, the section, as so enacted, could be applied only to forward contracts, not to options.

Respondent also contends that the addition of the phrase "or the settlement of which depends upon the value of" in DEFRA was intended to deal with uncertainty as to whether cash-settled forward contracts were included in the definition of foreign currency contracts. In respondent's view, the change was not intended to expand the application of section 1256 to foreign currency option contracts because the limiting phrase "which requires delivery of" was left in the statute. Respondent argues that foreign currency contracts can be physically settled or cash-settled, but they still must require settlement at expiration. In support of his position, respondent directs us to the House Ways and Means Committee report explaining the provisions of DEFRA, which states:

> Because certain contracts may call for a cash settlement by reference to the value of the foreign currency rather than actual delivery of the currency, the bill provides that *the delivery of a foreign currency requirement is met where the contract provides for a settlement determined by reference to the value of the foreign currency*. [H. Rept. 98–432 (Part 2), at 1646 (1984; emphasis added.]

## VI. *The Court's Holding on Section 1256*

Each party claims that the plain meaning of section 1256(g)(2)(A)(i) supports his position. In *Campbell v. Commissioner*, 108 T.C. 54, 62–63 (1997), we set out the well-established and well-understood rules for construing a provision of the Internal Revenue Code:

In construing * * * [a provision of the Internal Revenue Code], our task is to give effect to the intent of Congress, and we must begin with the statutory language, which is the most persuasive evidence of the statutory purpose. *United States v. American Trucking Associations, Inc.*, 310 U.S. 534, 542–543 (1940). Ordinarily, the plain meaning of the statutory language is conclusive. *United States v. Ron Pair Enters. Inc.*, 489 U.S. 235, 242 (1989). Where a statute is silent or ambiguous, we may look to legislative history in an effort to ascertain congressional intent. *Burlington N. R.R. v. Oklahoma Tax Commn.*, 481 U.S. 454, 461 (1987); *Griswold v. United States*, 59 F.3d 1571, 1575–1576 (11th Cir. 1995). However, where a statute appears to be clear on its face, we require unequivocal evidence of legislative purpose before construing the statute so as to override the plain meaning of the words used therein. *Huntsberry v. Commissioner*, 83 T.C. 742, 747–748 (1984); see *Pallottini v. Commissioner*, 90 T.C. 498, 503 (1988), and cases there cited.

We will therefore begin with the statute. The plain meaning of the words used will control unless there is unequivocal evidence of legislative purpose to override such meaning.

For convenience, we again set out section 1256(g)(2)(A), which defines a foreign currency contract to be a contract—

(i) which requires delivery of, or the settlement of which depends on the value of, a foreign currency which is a currency in which positions are also traded through regulated futures contracts,

(ii) which is traded in the interbank market, and

(iii) which is entered into at arm's length at a price determined by reference to the price in the interbank market.

Petitioner views the legal distinction between a forward and an option to be insignificant. We disagree. A forward foreign currency contract is a bilateral contract between a seller and a buyer that obligates the seller, at the time of signing, to settle his obligation to perform by either delivering the currency or making cash settlement. Conlon & Aquilino, *supra* par. A1.02[2][a][i]. A foreign currency option is a unilateral contract that does not require delivery or settlement unless and until the option is exercised by the holder. An obligation to settle may never arise if the holder does not exercise its rights under the option. It is clear that, as originally enacted in 1982, section 1256(g)(1) applied only to forward contracts. The statute referred to a contract which required delivery of the foreign currency, not to a contract in which delivery was left to the discretion of the holder.

It is also clear that the 1984 amendment "or the settlement of which depends on the value of" was inserted to allow

a cash-settled forward contract to come within the term "foreign currency contract". Foreign currency contracts can be physically settled or cash-settled, but they still must require, by their terms at inception, settlement at expiration.[13] The statute's plain language is dispositive. There is no evidence in the legislative history that a literal reading of the statute will defeat Congress' purpose in enacting it. *Campbell v. Commissioner*, *supra* at 62–63.

Petitioners argue, by negative inference, that if the Secretary had wished to identify a foreign currency option as a "contract (or type of contract)" to be "[excluded] from the application of subparagraph (A)" of section 1256(g)(2), the Secretary would have exercised the authority, expressly delegated by subparagraph (B), to prescribe regulations for that purpose. We disagree. The Secretary has not issued regulations bringing a foreign currency option within the definition of a foreign currency contract. That determination is within the province of the Secretary, not within the province of this Court. Moreover, the statute, as we understand it, speaks for itself.

Petitioners' contention that an option is a contract and that the addition by Congress of other option contracts to section 1256 over the years evidences an intent to include major foreign currency options also fails. Granted, an option is a contract and Congress has added other option contracts that qualify for section 1256 treatment. However, Congress' additions have been restricted to nonequity options, dealer equity options, and options on dealer securities futures, all of which are traded on a qualified board or exchange. Sec. 1256(b)(3)–(5), (g)(3)–(6). Interbank markets have not been designated as a qualified board or exchange. Sec. 1256(g)(7). When Congress has specified the types of contracts that come within the definition of a section 1256 contract, exclusion of others from its operation may be inferred.[14] There is no evi-

---

[13] The amendment is similar to that proposed by the Senate for cash-settlement of regulated futures contracts in 1982. See S. Rept. 97–592, at 276 (1982), 1983–1 C.B. 475, 485–486.

[14] The maxim expressio unius est exclusio alterius, meaning that to express or include one thing implies the exclusion of the other, or of the alternative, applies. Black's Law Dictionary 661 (9th ed. 2009); see *United States v. Smith*, 499 U.S. 160, 167 (1991) ("'Where Congress explicitly enumerates certain exceptions * * * additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.'" (quoting *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616–617 (1980))).

dence of legislative intent to designate foreign currency options as section 1256 contracts.

Petitioners also contend that futures, forwards, and options "accomplish the same economic access to currency risk" and should be treated the same way under the tax laws. However, petitioners admit that futures, forwards, and options differ in their pricing, timing, and payment structures. It is precisely these economic and legal distinctions that give rise to disparate treatment under the tax laws.

VII. *Conclusion and Holding*

With respect to the first issue presented to us by respondent's motion for partial summary judgment, we hold that under section 1256, the major foreign currency option assigned by Summitt to the charity is not a foreign currency contract as defined in section 1256(b)(2) and (g)(2), and the marked-to-market provisions of section 1256 do not apply to the transfer of the EUR call option (3032) to the charity. As a result, petitioners did not recognize a loss in 2002 on the EUR call option (3032) pursuant to section 1256.

The second issue raised by respondent's motion for partial summary judgment deals with the recognition of gain upon assignment of the minor foreign currency call option to charity. That issue cannot be dealt with isolated from the facts involved in the transaction as a whole, and therefore, respondent's motion on the second issue will be denied.

To reflect the foregoing,

*An appropriate order will be issued.*