RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0007p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

TERRY L. WRIGHT; CHERYL A. WRIGHT,

        *Petitioners-Appellants,*

    *v.*

COMMISSIONER OF INTERNAL REVENUE,

        *Respondent-Appellee.*

No. 15-1071

Appeal from the United States Tax Court
No. 30957-09—Maurice B. Foley, Judge.

Argued: October 6, 2015

Decided and Filed: January 7, 2016

Before: KEITH, ROGERS, GRIFFIN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Adam H. Charnes, KILPATRICK TOWNSEND & STOCKTON, LLP, Winston-Salem, North Carolina, for Appellants. Anthony T. Sheehan, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Adam H. Charnes, KILPATRICK TOWNSEND & STOCKTON, LLP, Winston-Salem, North Carolina, Charles E. Hodges II, KILPATRICK TOWNSEND & STOCKTON, LLP, Atlanta, Georgia, James E. Brown, KILPATRICK TOWNSEND & STOCKTON, LLP, Washington, D.C., for Appellants. Anthony T. Sheehan, Francesca Ugolini, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

───────────────

## OPINION

───────────────

ROGERS, Circuit Judge. Section 1256 of the Internal Revenue Code provides that an investor who holds certain types of derivatives at the close of the taxable year must "mark to

1

market" those derivatives by treating them as having been sold for their fair market value on the last business day of the taxable year. A "foreign currency contract" is a "section 1256 contract" that an investor must mark to market at the end of the taxable year. I.R.C. § 1256(b)(1). Contending that a foreign currency option is within the definition of a "foreign currency contract" under § 1256, Cheryl and Terry Wright claimed a large tax loss by marking to market a euro put option upon the Wrights' assignment of the option to a charity. The Wrights' assignment of this option was part of a series of transfers of mutually offsetting foreign currency options that the Wrights executed over a period of three days. These transactions appear to have allowed the Wrights to generate a large tax loss at minimal economic risk or out-of-pocket expense. The Tax Court rejected the Wrights' attempt to generate a tax loss in this manner, holding that the Wrights could not recognize a loss upon assignment of the euro put option because the Wrights' option was not a "foreign currency contract" under § 1256. While the Tax Court's disallowance of the Wrights' claimed tax loss makes sense as a matter of tax policy, the plain language of the statute clearly provides that a foreign currency option can be a "foreign currency contract." It is therefore necessary to reverse and remand.

I.

A.

The Commissioner's brief provides a useful preliminary explanation of the financial terms involved in this case, mark-to-market accounting under § 1256, and major-minor tax shelters:

> Options belong to a group of financial products called "derivatives" because their value is derived from the price of an underlying asset. Three types of foreign currency derivatives are relevant here: forwards, futures, and options. "Forwards" are bilateral private contracts that require one party to deliver a specified amount of a foreign currency on a specified future date for a specified dollar price. Typically, neither party makes a payment when the forward contract is signed. Rather, settlement occurs on the specified future date. "Futures" are similar to forwards, but futures are highly standardized to enable them to be traded on a regulated exchange. "Options" are unilateral contracts under which the obligated party need not deliver the foreign currency unless the party holding the option exercises it by a specified date. Many derivatives allow cash settlement, *i.e.*, payment of the dollar value of the foreign currency, in lieu of the physical

delivery of the currency.  It is therefore possible to trade in foreign currency options without holding any currency.

In a foreign currency option, one party pays a "premium" to acquire the right—but not the obligation—to buy from or to sell to the other party (the "counterparty") a specified amount of a foreign currency (the "notional amount") at a specified price (the "strike price") on or before a specified future date.    The party buying the option takes the "long" position, whereas the party "writing" and selling the option takes the "short" position.  An option giving its purchaser the right to buy is a "call"; the writer must deliver if (but only if) the option is exercised.  An option giving its purchaser the right to sell is a "put"; the writer must accept if (but only if) the option is exercised. . . .

The value of a derivative will vary over time based upon such factors as the price of the underlying asset, the expected trends in that price, and the time until the derivative can be exercised.  For tax purposes, investors generally recognize gain or loss in the taxable year in which they sell or dispose of an asset.  I.R.C. § 1001.    For certain derivatives, however, the mark-to-market rules of § 1256(a) require an investor holding a covered derivative at the end of a year: (i) to treat the derivative as having been sold for its fair market value on the last business day of the year; (ii) to recognize capital gain or loss at the ratio of 40% short term and 60% long term; and (iii) to make a proper adjustment to his basis.  Under § 1256(c)(1), the mark-to-market rules also apply to the termination or transfer during the taxable year of the taxpayer's rights or obligations with respect to the derivative, *inter alia*, by acquiring an offsetting derivative or by assigning the derivative.

Derivatives subject to § 1256 are called "section 1256 contracts," which term includes "any foreign currency contract."  I.R.C. § 1256(b)(1).  At issue here is the definition of "foreign currency contract" provided in § 1256(g)(2)(A). The parties dispute whether an over-the-counter option in a major currency (*e.g.*, the euro) is a § 1256 contract that must be marked to market.  An "over-the-counter" or "OTC" option is a private contract not traded on a regulated exchange. A currency is a "major currency" if positions in it are also traded through regulated futures contracts.  [The Wrights take the position that an] over-the-counter option in a minor currency (*e.g.*, the Danish krone . . .) is *not* a § 1256 contract and is not subject to the mark-to-market rules. . . .

The major-minor tax shelter was designed to manipulate the mark-to-market rules as follows.  Notice 2007-71, 2007-2 C.B. 472-73.  *See*, *e.g.*, [*Summitt v. Commissioner*, 134 T.C. 248, 249−54 (2010)].  The taxpayer arranges with a counterparty for four OTC options.  The taxpayer buys from the counterparty a euro call and a euro put on mirror-image terms.  The taxpayer also sells to the counterparty a krone call and a krone put on mirror-image terms.  The premiums paid to and received from the counterparty mostly offset each other.  Because the call and put for each currency are mirror images of each other, one will rise while

the other will fall.  Because the krone is closely tied to the euro, both calls should largely offset each other, as should both puts.

The taxpayer and the counterparty then retain their premiums, but the taxpayer assigns to a charity his rights and obligations under the depreciated euro option and the appreciated (and offsetting) krone option (*i.e.*, the charity receives both calls or both puts).  The taxpayer asserts that the assignment of the losing euro option is a recognition event under § 1256(c)(1), and he invokes the mark-to-market rules to claim a loss.  *See Greene v. United States*, 79 F.3d 1348, 1353−58 (2d Cir. 1996) (donation of regulated futures contract to charity is a recognition event).  Because [the taxpayer takes the position that] the krone option is not a § 1256 contract, the taxpayer recognizes gain, if ever, when his obligation to perform is terminated by the closing or lapse of the option.  The taxpayer and the counterparty then terminate the unassigned options so that the gain on one offsets the loss on the other.    If the taxpayer's reading of § 1256 is correct, he receives a large tax loss with minimal economic risk or out-of-pocket expense.  Moreover, because the options are offsetting and can be settled in dollars, the nominal amounts of foreign currency can be set well beyond the means of the parties, so as to generate the tax loss desired by the taxpayer.

B.

Terry Wright was the chief technology officer of a software company until he became an investor in 2000.  In 2002, Terry Wright and his wife Cheryl Wright each owned a fifty-percent member interest in an investment company called Cyber Advice, LLC, which was taxed as a partnership.  In 2002, a company called Multi National Strategies, LLC presented an investment opportunity involving major-minor foreign currency option transactions to the Wrights.

The Wrights and Cyber Advice authorized Multi National and its affiliate Castle Transactions, LLC to execute investments that included various over-the-counter foreign currency options.  The Wrights and Cyber Advice also agreed that Beckenham Trading Company, Inc. would be the counterparty to the trades and authorized Multi National to assign some of these options to the Foundation for an Educated America, Inc., a charity.

In December 2002, Cyber Advice transferred $550,000 to a Beckenham account.  Cyber Advice then engaged in several transactions involving foreign currency options.  These transactions included four options that are relevant here.

In particular, on December 20, 2002, Cyber Advice purchased a euro put option for a premium of $36,177,750, which gave Cyber Advice the right to sell to Beckenham

1,237,477,902 euros for $1,260,000,000 on the expiration date of the option. Cyber Advice also purchased a euro call option from Beckenham with terms that were the mirror-image of the euro put option. Stated another way, this option gave Cyber Advice the right to buy 1,237,477,902 euros from Beckenham for $1,260,000,000. At this time, Cyber Advice also sold a krone call and krone put to Beckenham on mirror-image terms.

On December 23, 2002, Cyber Advice assigned the euro put option and krone put option to the Foundation for an Educated America. At the time of assignment, the euro put option was valued at $33,018,574 and the krone put option was valued at $33,012,274. Cyber Advice also sold the euro call option to Beckenham and repurchased the krone call option from Beckenham.

In October 2003, Cyber Advice and the Wrights filed their 2002 income tax returns. Cyber Advice reported short-term capital gains and losses for three of the option transactions but did not report the gain from the krone put, reporting a total net short-term capital loss, including other transactions not relevant here, of $2,970,822. The Wrights took the position that they did not need to recognize the gain from the assignment of the krone put option to the Foundation for an Educated America because over-the-counter options on minor foreign currencies such as the krone were not § 1256 contracts to which mark-to-market accounting applied. The Wrights also took the position that recognition of a short-term capital loss from the assignment of the euro put option to the Foundation for an Educated America was proper because the assignment of the euro put option resulted in a termination under § 1256(c) and because the euro put option was a "foreign currency contract" subject to § 1256. Because Cyber Advice was taxed as a partnership, its loss flowed to the Wrights. The Wrights reported the $2,970,822 loss on their return, which aided in reducing the Wrights' capital gains from more than $3.4 million to $454,477.

On October 2, 2009, the Commissioner issued the Wrights a notice of deficiency of $603,093 on the Wrights' 2002 income taxes based on the IRS's determination that the Wrights had improperly claimed a $2,970,822 net capital loss in relation to the major-minor transactions. In addition to its assertion that the Wrights could not claim this capital loss because the option was not subject to § 1256, the IRS asserted other grounds supporting this disallowance. The notice also claimed an accuracy-related penalty of $120,618.60 based on negligence, substantial

understatement of tax, or substantial valuation misstatement.  The Wrights petitioned the Tax Court, contesting the deficiency and penalty.

The Tax Court granted the Commissioner's motion for partial summary judgment, upholding imposition of the deficiency on the basis that the option was not subject to mark-to-market accounting because the option was not a "foreign currency contract" under § 1256. *Wright v. Comm'r*, 102 T.C.M. (CCH) 597, 2011 WL 6440420, at *3 (2011).  The Tax Court noted that it had recently held in *Summitt v. Commissioner*, 134 T.C. 248 (2010)—a case that also involved a major-minor transaction and some of the entities involved in this case—and *Garcia v. Commissioner*, 101 T.C.M. (CCH) 1388 (2011), that a major foreign currency option is not a "foreign currency contract."  *Wright*, 2011 WL 644020 at *2.  The Tax Court explained that a foreign currency option does not meet the "delivery" or "settlement" requirement under § 1256(g)(2) because a foreign currency option does not require delivery or settlement "unless and until" the holder exercises the option.  *Id.* at *3 (citations omitted).  Relying on *Summitt*, the Tax Court also noted that it was "clear" that the statute as originally enacted applied only to forward contracts which require delivery of the foreign currency.  *Id.*  Further, the Tax Court reasoned that because the phrase "or the settlement of which depends on the value of" was added to § 1256 to allow cash-settled forward contracts to come within the term "foreign currency contract," § 1256(g)(2)(A)(i) mandated that "foreign currency contracts" require settlement at expiration.  *Id.* (citing *Summitt*, 134 T.C. at 264–65).  Noting that the Wrights had not attempted to distinguish the instant case from *Summitt* and *Garcia*, the Tax Court also rejected the Wrights' assertion that those cases were wrongly decided.  *Id*.  The Tax Court therefore concluded that the Wrights' euro put option was not a "foreign currency contract" because the option was not a contract that "requires delivery of, or the settlement of which depends on the value of, a foreign currency" as set forth in § 1256(g)(2)(A)(i).  *Id*.

The parties later filed a joint motion to submit the penalty question to the Tax Court on a fully stipulated record.  The Tax Court determined that the Wrights were subject to a penalty for substantial understatement of income tax under I.R.C. § 6662(d)(1)(A).  *Wright v. Comm'r*, 108 T.C.M. (CCH) 222, 2014 WL 4251050, at *2 n.5 (2014).  The Tax Court further held that the Wrights failed to establish that they acted with reasonable care and in good faith or that there

was substantial authority for their return position. *Id*. at *2. The Tax Court rejected the Wrights' reasonable care and good faith defense because the Tax Court concluded that the Wrights did not establish that they reasonably and in good faith relied on professional advice in taking their return position. *Id*. The Tax Court also held that an opinion that the Wrights received from a tax attorney stating that a court would more likely than not uphold the Wrights' tax treatment of the transactions did not provide the Wrights with substantial authority for their position. According to the Tax Court, the opinion was "not well reasoned and ignored the plain language of the statute." *Id*. The Tax Court therefore held that the Wrights should be subject to the penalty. *Id*.

## II.

The Tax Court's reasoning appears to be supported by sound tax policy, but nonetheless conflicts with the plain language of § 1256. Section 1256 provides that a "foreign currency contract" is a contract "the settlement of which depends" upon the value of a foreign currency even if that contract does not mandate that any such settlement occur. I.R.C. § 1256(g)(2)(A)(i). In interpreting a provision of the Internal Revenue Code, this court "look[s] first to the plain language of the statute." *The Limited, Inc. v. Comm'r*, 286 F.3d 324, 332 (6th Cir. 2002) (citations omitted). Section 1256(g)(2) defines a "foreign currency contract" as:

> (A) Foreign currency contract.--The term "foreign currency contract" means a contract--
>
> (i) which requires delivery of, or the settlement of which depends on the value of, a foreign currency which is a currency in which positions are also traded through regulated futures contracts,
>
> (ii) which is traded in the interbank market, and
>
> (iii) which is entered into at arm's length at a price determined by reference to the price in the interbank market.

The plain language of § 1256 does not provide that a "foreign currency contract" must require either a "delivery" or a "settlement." Rather, the statute provides that a "foreign currency contract" is (1) "a contract . . . which requires delivery of . . . a foreign currency" or (2) "a contract . . . the settlement of which depends on the value of . . . a foreign currency." The use of the word "or" between the "delivery" and "settlement" phrases indicates that these phrases describe two ways in which a contract may qualify as a "foreign currency contract." Further, the

use of a comma after "delivery of" establishes that the word "requires" does not apply to the settlement prong.  Section 1256(g)(2)(A)(i) therefore provides that a contract "the settlement of which depends" on the value of a foreign currency is a "foreign currency contract," even if that contract does not mandate that any such settlement occur.

The Commissioner's position that § 1256(g)(2)(A)(i) is a "unified provision" which provides that a "contract must mandate at maturity either a physical delivery of a foreign currency or a cash settlement based on the value of the currency" is contrary to the plain language of the statute.  In order to interpret the statute to provide that "foreign currency contract" is a contract that requires a settlement, one would have to read the statute to state that a "foreign currency contract" is (1) "a contract . . . which requires . . . delivery of . . . a foreign currency" or (2) "a contract . . . which requires . . . the settlement of which depends on the value of, a foreign currency."  Such a reading goes against the plain language of the statute because the phrase "a contract . . . which requires . . . the settlement of which depends on the value of, a foreign currency" is syntactically incoherent.  Further, contrary to the Commissioner's assertion, the inclusion in § 1256 of a rule that applies to the cash settlement of a contract does not make it "implicit" that a settlement of the contract must actually occur.  Instead, § 1256 provides that if a settlement of a "foreign currency contract" does occur, any such settlement must depend on the value of a foreign currency.

The Wrights' euro put option meets the "settlement" prong of § 1256(g)(2)(A)(i) because the Wrights' euro put option is a contract the settlement of which depends on the value of a foreign currency.  The Wrights' euro put option is a "contract" because an option is "a promise which meets the requirements for the formation of a contract and limits the promisor's power to revoke an offer."  Restatement (Second) of Contracts § 25 (1981).  It is true that "[a]n obligation to settle [the Wrights' euro put option] may never arise if the holder does not exercise its rights under the option" because a "foreign currency option is a unilateral contract that does not require delivery or settlement unless and until the option is exercised by the holder."  *Summitt*, 134 T.C. at 264.  Thus, whether a foreign currency option such as the Wrights' euro put option is exercised and at what date exercise occurs will not necessarily depend on the value of the foreign currency in which the option is denominated because the holder of the option could decide

whether to settle the option for reasons that are unrelated to the value of the foreign currency. However, any settlement of such an option that does occur will necessarily depend on the value of the foreign currency in which the option is denominated because if the option is exercised, the amount the seller of the foreign currency must pay the buyer will depend on the value of that foreign currency at the time the option is exercised. Accordingly, the Wrights' euro put option meets the "settlement" prong of § 1256(g)(2)(A)(i) because the Wrights' euro put option is a contract "the settlement of which depends on the value of" the euro, which is a foreign "currency in which positions are also traded through regulated futures contracts."[1]

Because the plain language of § 1256 clearly provides that the Wrights' euro put option meets the "settlement" prong of § 1256(g)(2)(A)(i), we need not resort to legislative history to interpret § 1256. The Tax Court concluded that a foreign currency option does not fall within the meaning of a "foreign currency contract" in part because the Tax Court determined that Congress added the "settlement" prong to § 1256 in order to allow cash-settled forward contracts to come within the definition of "foreign currency contract" only if these cash-settled forward contracts required, "by their terms at inception, settlement at expiration." *Wright*, 2011 WL 6440420 at *3 (citing *Summitt*, 134 T.C. at 264−65). Similarly, the Commissioner contends that Congress added the settlement prong to the definition of a "foreign currency contract" not to remove "the delivery of a foreign currency requirement" but to allow "that requirement to be met with a cash settlement." However this may be, the plain language of § 1256, as stated above, clearly establishes that the Wrights' euro put option meets the "settlement" prong of § 1256(g)(2)(A)(i).

We see no conceivable tax policy that supports this interpretation of the plain language of § 1256, and none has been suggested to us by the parties. To the contrary, this interpretation of § 1256 seems to allow the Wrights to engineer a desired tax loss by paying only a minimal cash outlay and by engaging in major-minor transactions that subject the Wrights to little actual economic risk. Although these transactions involve large sums of dollars, euros, and krones, these transactions appear to have subjected the Wrights to little actual economic risk because the four options in the major-minor transactions offset each other. Further, when the premium

---

[1]Because the "settlement" and "delivery" prongs are alternative methods by which a contract can fall within the "foreign currency contract" definition, we do not reach the issue of whether the Wrights' euro put option meets the "delivery" prong of § 1256(g)(2)(A)(i).

payments are netted against each other, the transactions subjected the Wrights to a short-term capital loss of only $25,200.  Accordingly, the Wrights were able to pay $50,200 out of pocket—based upon the Wrights' short-term capital loss of $25,200 and payment of $25,000 to a tax attorney for a tax opinion—in order to reduce their taxes by at least the $603,093 deficiency upheld by the Tax Court.  Moreover, the Wrights did not plausibly explain how engaging in transactions involving transfers of offsetting foreign currency options that opened and closed over the course of three days could accomplish the Wrights' stated goals of investment diversification and realization of a significant economic return.  Accordingly, the Wrights appear to have engaged in the major-minor transactions primarily to generate the desired tax loss.

Congress may have wanted to create a different result when Congress added the "settlement" prong to § 1256.  Deficit Reduction Act of 1984, Pub. L. No. 98-369, § 105, 98 Stat. 494.  Congress explained that prior to this amendment a contract "require[d] delivery of a [major] foreign currency" to meet the "foreign currency definition."  H.R. Rep. No. 98-432, pt. 2, at 1646 (1984), *reprinted in* 1984 U.S.C.C.A.N. 697, 1269.  The House report indicates that Congress amended § 1256 to allow a contract that provides for a settlement in an amount determined by the value of the foreign currency, rather than actual delivery of the currency, to meet the "delivery" requirement of the "foreign currency contract" definition.  *Id.*  Congress may have wanted a contract that provides for settlement in cash to fall within the "foreign currency contract" definition only if that contract mandates settlement at maturity.  If Congress had wanted to expand the definition of a "foreign currency contract" to include only such contracts, Congress could have amended § 1256(g)(2)(A)(i) to provide that a "foreign currency contract" is a contract "which requires delivery of, or *which requires* a settlement which depends on the value of, a foreign currency."  But Congress did not amend § 1256 in this way.

The fact that tax policy does not appear to support allowance of the Wrights' claimed loss is not sufficient to reform the statutory language, for two reasons.  First, the court's attempt to reform § 1256 might unintentionally permit other tax-avoidance schemes.  Second, Congress provided two escape hatches to guard against the type of adverse tax policy outcome at issue here.  In particular, Congress allows the Secretary of the Treasury to prescribe regulations to exclude any type of contract from the "foreign currency contract" definition if the

inclusion of this type of contract would be "inconsistent" with the purposes of § 1256. I.R.C. § 1256(g)(2)(B). The Secretary therefore could prevent future taxpayers from relying on § 1256 to mark to market foreign currency options by issuing a regulation that excludes foreign currency options from the definition of a "foreign currency contract." Further, Congress also allows the Commissioner to prevent taxpayers from claiming tax losses based upon transactions involving offsetting foreign currency options by challenging specific transactions under the economic substance doctrine, as lacking in economic substance. *See* I.R.C. § 7701(o) (providing that a transaction shall be treated as having economic substance only if "the transaction changes in a meaningful way (apart from Federal income tax effects) the taxpayer's economic position" and "the taxpayer has a substantial purpose (apart from Federal income tax effects) for entering into such transaction"). These statutorily provided bases for dealing with tax shelters that may violate the underlying policy of the Internal Revenue Code make it doubly inappropriate for this court to try to achieve such a result by torturing the plain language of the statute.[2]

Our reversal of the Tax Court's decision upholding the imposition of the deficiency also necessitates reversal of the Tax Court's decision upholding imposition of a penalty on the Wrights based on this deficiency. Because we reverse the Tax Court's decision upholding the imposition of the $603,093 deficiency, we also reverse the Tax Court's decision imposing a penalty based upon that deficiency.

This case is therefore reversed and remanded for further proceedings consistent with this opinion.

---

[2]We do not address specifically, however, the applicability of these provisions to the Wrights' transactions.