T.C. Memo. 2016-221

UNITED STATES TAX COURT

BORIS PUTANEC AND JEANA J. TONEY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 13025-08, 27211-10.          Filed December 6, 2016.

<u>William F. Colgin</u>, <u>William B. Clayton</u>, and <u>Christina K. Harper</u>, for petitioners.

<u>Roy Wulf</u>, <u>Kevin G. Croke</u>, <u>Shannon L. Cohen</u>, <u>Kaelyn J. Romey</u>, and <u>Jon D. Feldhammer</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  Boris Putanec achieved great wealth by the time he was thirty.  But that was during the '90s tech boom; the wealth was mostly on paper, and it did not last.  On the way up he tried to free some of the gain he was

**[*2]** enjoying without actually selling much of his stock and without paying tax on what he did sell.  Sharp promoters offered to help him do so and lured him in with promises of giant paper losses to keep his tax bill down.  Putanec claimed $112 million in capital losses on his 2000 and 2001 returns.  These losses were dealt to Putanec in a CARDS--custom adjustable rate debt structure--transaction.  Over $65 million of those losses were carried forward to his and his wife's 2006 return.[1]  The Commissioner disallowed them and issued notices of deficiency for more than $35 million for tax years 2000, 2001, and 2006.  We determine what, if anything, Putanec can deduct as losses from the CARDS deal, and whether he is entitled to deduct the costs of the foreign-currency exchange contracts (FX contracts) their use required.[2]

---

[1] Jeana Toney is a party only because she and her husband filed a joint return.

[2] Because we decided this issue on a preponderance of the evidence, we need not decide whether the burden of proof shifts to the Commissioner under section 7491.  See Knudsen v. Commissioner, 131 T.C. 185, 189 (2008).  (All references to sections are to the Internal Revenue Code and regulations in effect for the years at issue; all references to Rules are to the Tax Court Rules of Practice and Procedure.)

[*3]                          FINDINGS OF FACT

I.      <u>Putanec and Ariba</u>

Putanec's useful genius was noticeable at an early age.  After he earned

bachelor's and master's degrees in computer science at Brown University, he

began working for Kaleido Labs as an engineer and swiftly rose to become a

senior executive for Internet Shopping Company.

His career on the high-tech fast track accelerated even more when he and six

business colleagues grabbed lunch at a local cafe in Sunnyvale, California.  They

shared the same flash of inspiration--that the boring but essential procurement

process for businesses--filled with forms to be completed in triplicate, interoffice

envelopes with red strings, and vendors who completed purchase orders on paper

and in ink on the backs of their sample cases--was aching for computerization.

Drawing on their placemats with the jar of crayons provided by the cafe, they

came up with a solution.  Shortly thereafter they incorporated Ariba Technologies,

Inc.  They knew that if they got this right every business in the world would be a

potential customer.

The seven founders of Ariba set to work quickly.  Putanec's role was to

design and write the software.  His salary was $90,000, but he also received

376,000 shares of Ariba stock.  In less than one year they released their first

**[*4]** product, called Ariba Buyer.[3]  The product saw modest success, eventually leading the company to release the Ariba Supplier Network in 1999.  This network was a hub where suppliers could post electronic catalogs of their products, and buyers could send purchase orders through the same network.[4]  By today's standards, this network might seem dated, but it was a big step in business-to-business ecommerce.

Ariba's first-year sales were around $800,000, respectable for a company drawn up in crayon.  The second year they were $8 million.  By the third year, sales reached $45 million.  It was clear that more investors wanted in, and Ariba gave them what they wanted:  In 1999 Ariba went public.  The share price rocketed up 300% on its first day of trading, which gave the company a value of

---

[3] PJ Jakovljevic, <u>Ariba's 15-Year Journey into the B2B Commerce Cloud</u>, Technology Evaluation Centers (June 16, 2011, 2:27 PM), http://exchange.ariba.com/servlet/JiveServlet/previewBody/1909-102-1-2129/Ariba%2015%20Years%20Journey%20June%202011.pdf.  We note that this short course on Ariba's history is drawn from extrarecord sources.  The history is for engaging background alone and is immaterial to the contested facts and issues.

[4] <u>See</u> James Kwak, <u>The Myth of Ariba</u>, The Baseline Scenario (Jan. 18, 2010), http://baselinescenario.com/2010/01/18/the-myth-of-ariba.

**[*5]** $6 billion.  Ariba followed this impressive showing with $274 million in sales in its fourth year.  Its market cap soared to nearly $40 billion.[5]

General Motors' market cap that year topped out at $56 billion,[6] and maybe people should have thought there was something not quite right about the values the market was putting on tech companies.  But it's in the nature of bubbles to distort the vision of those inside them.  And so it was in the late '90s through 2000.  The incredible rise in the value of tech companies had been generated mostly by ideas, such as a 178% increase in the stock of Books-A-Million the day it simply launched a "newly enhanced" web site.[7]  Some analysts looked back and realized the market was full of "irrational exuberance."  All analysts eventually realized that profitability mattered even for tech companies and that the majority of them had nothing more than ideas.  From March 2000 to October 2002 the tech

---

[5] See Tomasz Tunguz, From $800k to $274M in 4 Years--the Story of Ariba, Tomtunguz.com (May 14, 2015), http://tomtunguz.com/ariba-history.

[6] Matt Nesto, GM's Market Value Is Only $7 Billion--Half That of Avon, CNBC (Jun. 26, 2008), http://www.cnbc.com/id/25392542.

[7] See Investors Are Still Online Mavens, AMD Looks Chipper and Newbridge Builds Gain, CNN Money (Nov. 25, 1998), http://money.cnn.com/1998/11/25/markets/hotstox2p.

[*6] bubble's burst wiped $5 trillion in paper wealth off the NASDAQ, as the total market value of the NASDAQ fell from $6.7 trillion to $1.6 trillion.[8]

While Putanec held Ariba stock, the stock split 2 for 1 four times, bringing his maximum holdings--if he hadn't sold any of the stock--to just over 6 million shares. Even though he had sold some of his shares, by December 2000 Putanec still held over 5 million. This was certainly a good position to be in when the company was valued at $40 billion.

Alas. Only in name could Ariba be up forever.

A Wall Street phrase, the "dead cat bounce," is anathema to ailurophiles but a memorable way to describe the phenomenon that a stock whose price is collapsing usually suffers a decline followed by an illusory rally as investors try to guess where the bottom will be. Harboring fantasies that the tech bust was limited to companies that focused on consumers, the high-tech dead-cat bounce briefly inspired a rally in tech companies that aimed at the business-to-business market. Ariba was one of these, and it rallied to a high of about $186 per share in September 2000. The rally didn't last. On December 4, 2000, Ariba's shares sank to $64, and on December 20, 2000, to $47.25. Three months later in March 2001

---

[8] Chris Gaither & Dawn C. Chmielewski, Fears of Dot-Com Crash, Version 2.0, Los Angeles Times (July 16, 2006), http://articles.latimes.com/2006/jul/16/business/fi-overheat16.

[*7] Ariba had fallen to around $8 per share. Putanec's paper wealth followed the same trajectory:

| Date | Shares held (approximate) | Share price | Total value |
|---|---|---|---|
| IPO - 1999 | 5 million | $23.000 | $115 million |
| 9/2000 | 5 million | 186.000 | 930 million |
| 12/4/2000 | 5 million | 64.000 | 320 million |
| 12/11/2000 | 5 million | 87.250 | 436 million |
| 12/14/2000 | 5 million | 67.125 | 336 million |
| 12/20/2000 | 5 million | 47.250 | 236 million |
| 3/28/2001 | 5 million | 8.250 | 41 million |

Thus, from its high point in September 2000 to March 2001, Putanec's wealth from the stock went from close to $1 billion to just over $40 million.

It is easy enough in retrospect for an outsider to this remarkable era to wonder why the fortunate entrepreneurs of the time didn't all cash out when they could. Having so much of one's wealth in a single asset--there were times when 95% of Putanec's wealth was concentrated in Ariba stock--would seem to violate some older wisdom about the benefits of diversification. Easy enough to say now, but when these tech companies were booming, they were often (like Ariba) still private and had shareholders who were still working to make their companies successful. So when someone like Putanec wanted to buy something, he would

[*8] often have to decide if he wanted to sell stock or monetize that stock in some other fashion. Selling stock could be difficult--the investment banks that handle the IPOs traditionally require a lockup period that restricts shareholder-employees from selling Ariba shares immediately after a company goes public.[9] Putanec's first opportunity to sell post-IPO occurred on October 22, 1999, at the end of the first "blackout date."[10] And he made good use of that chance. In October and November of that year Putanec sold a total of 85,000 shares of Ariba stock. The following year between February and November he sold 100,000 shares, leaving himself with over 5 million shares.

---

[9] These restrictions are meant to prevent the insiders who hold stock from flooding the market during the company's first months as a public corporation. Insiders' selling shares of a company soon after an IPO could give the impression that they lack faith in their work, possibly leading to a drop in the share price. See Amy Fontinelle, What Is an IPO Lock-Up Period and How Long Is it?, Investopedia, http://www.investopedia.com/ask/answer/12/ipo-lockup-period.asp.

[10] Blackout dates are distinct from lockup periods. Lockup periods are usually imposed by underwriters so the market doesn't flood with stock as soon as the company becomes public; blackout dates are used to avoid insider-trading problems. The company self-imposes a policy that restricts employees (perhaps only key employees) from trading their stock when the company is in possession of valuable insider information. The blackout date generally ends when the company issues an annual or a quarterly report. See, e.g., Dialog4 Sys. Eng'g GmbH v. Circuit Research Labs, Inc., 622 F. Supp. 2d 814, 817 n.1 (D. Ariz. 2009).

[*9]   Despite these sales, Putanec wanted to hold onto as many shares as possible. He testified that even during the tumult of the dot-com boom, he "was very bullish" concerning Ariba's future. He explained: "[Ariba was] one of the few survivors standing after the March, 2000, NASDAQ crash. * * * I was of the opinion that if I was selling substantial amounts of stock I would be hurting my future net worth." Believing that the price would rebound, then, Putanec sought other ways to monetize his Ariba stock.

Enter myCFO, Inc. In early 2000 Putanec retained myCFO for tax-preparation services. MyCFO also began to provide him with wealth-management services and urged him to diversify his holdings in Ariba. MyCFO advised him to liquidate $100 million of his Ariba stock holdings to safely diversify. He resisted. Citing technology magnates such as Bill Gates, Putanec thought the best long-term strategy would be to ride the wave of price fluctuations and stick with his Ariba holdings. But to assuage the advisers at myCFO he began to diversify a little by putting a bit of his wealth into real estate and several limited partnership investments (usually around $100,000 to $1 million).

Those investments required cash on hand, something that was hard to come by when so much of his wealth was in one company's stock. Putanec raised this concern with myCFO, and that's how he first learned about CARDS.

[*10] II.    CARDS Transaction

CARDS transactions aren't new to this Court.  See generally Hunter v. Commissioner, T.C. Memo. 2014-132; Crispin v. Commissioner, T.C. Memo. 2012-70, aff'd, 708 F.3d 507 (3d Cir. 2013); Kerman v. Commissioner, T.C. Memo. 2011-54, aff'd, 713 F.3d 849 (6th Cir. 2013); Country Pine Fin., LLC v. Commissioner, T.C. Memo. 2009-251.  And though the specific facts of each deal invariably differ, many of the players and processes are the same.  There are generally three stages:

- •    loan origination;

- •    loan assumption; and

- •    loan "operation".

See Kerman, T.C. Memo. 2011-54, 2011 WL 839768, at *2.

A.    Chenery the Promoter

The CARDS transaction was developed and marketed by Chenery Associates, Inc. (Chenery).  Roy Hahn, Chenery's founder, worked with some New York investment banks to find possible customers, though referrals usually came from accounting and law firms.  Hahn worked specifically with R.J. Ruble at the law firm of Brown & Wood to procure an opinion that endorsed the deal's legality and tax benefits.  Chenery would collect fees for setting up the transaction

**[*11]** and then pay Ruble out of those fees. Chenery also paid other costs, such as bank, LLC, and legal fees.

Ruble regularly worked with accountants at KPMG who designed and marketed tax shelters. Those accountants would find clients and design the shelters, and Ruble would offer his legal opinion that they were on the up and up, thus--they hoped--shading the shelter from IRS scrutiny. It didn't work. The IRS caught on, and a jury ultimately convicted Mr. Ruble of tax evasion. See United States v. Ruble, No. S1 05 Crim 0888 (LAK), 2009 WL 911035 (S.D.N.Y. Apr. 2, 2009), aff'd sub nom. United States v. Pfaff, 407 F. App'x 506 (2d Cir. 2010).

B.     Basic Outline of CARDS Transactions

There are some standard steps in a CARDS transaction. First, Chenery would set up an LLC[11] with foreign members, and that LLC would borrow money from a bank. The loan would be in a foreign currency. The LLC would agree to repay the loan, and in return would receive two instruments: a certificate of deposit worth around 85% of the loan value, and a promissory note worth the remaining 15%. These two instruments became collateral for the loan itself, and

---

[11] LLC stands for limited liability company. LLCs are creatures of statute and are a form of business ownership that allows one or more people or organizations to invest in an entity that provides them with limited liability. An LLC with more than one member is generally taxed as a partnership by default. Sec. 301.7701-3(b)(1)(i), Proced. & Admin. Regs.

[*12] were typically kept in the bank. This essentially meant that the two parties (the LLC and the bank) exchanged promises, but no actual money. The interest payable on the loan would be higher than the interest receivable from the two instruments. This created a spread that the LLC would need to meet each year if it hoped to pay the interest charge. Chenery stepped in and made the interest payments until customers could be found.

The customer Chenery was looking for was a U.S. individual sitting on a large capital gain. The deal would get under way when the LLC would "sell" the promissory note to the U.S. individual in exchange for his promise to be jointly and severally liable on the entire loan, not just the 15% of the loan represented by the promissory note. The promissory note remained as collateral, but since the note was designed to be inadequate collateral for the entire loan, the customer would have to post additional collateral. Once he did, he would redeem the note and put the money into an account at the bank.

He could then post even more collateral of his own and, if that collateral was satisfactory to the bank, could withdraw cash from the account. But remember the customer's promise to be jointly and severally liable on the entirety of the loan? Chenery told each customer that this promise would make his basis equal to the total value of the loan and not just the value of the note. If the deal

[*13] worked, a customer who redeemed the note, posted additional collateral, and began withdrawing cash could claim a loss because his basis in the note was much higher than the amount of cash withdrawn. The customer could get money out, and a heaping tax loss to boot.

### C. Putanec's CARDS Transaction

Beginning in February 2000 Putanec met with Bill Woodson (his account manager at myCFO) and the group within myCFO that specialized in tax shelters. Hahn had pitched his CARDS transaction to myCFO as good for its clients. MyCFO passed the message along to Putanec, and he was intrigued. MyCFO then introduced him to a lawyer at LeBoeuf, Lamb, Greene & MacRae whom he hired to represent him in the CARDS transaction.

A short time later Putanec signed an engagement letter with Chenery in which he agreed to pay Chenery $3 million for the CARDS transaction. A month after that he notified Brown & Wood (Chenery's counsel) and myCFO of his plans. MyCFO then somewhat belatedly provided Putanec with a list of alternatives to CARDS that might unlock cash from his shares.

Among these were more traditional forms of financing such as loans. MyCFO identified four alternatives, and each was a revolving line of credit. The loan rates highlighted by myCFO included loans from Northern Trust (at up to the

[*14] London Interbank Offered Rate (LIBOR) plus 50 points, or 7.23%), Mellon (at the Federal Funds rate plus 1.5%, or 8.063%), Goldman Sachs (at the Broker Call rate plus 50 points, or 8.75%), and Salomon Smith Barney (at 8%). The interest rates were quoted on November 15, 2000, but by December 15, 2000, rates had dropped lower (e.g., the LIBOR had declined from 6.73% to 6.25%). This meant that when Putanec entered into the CARDS transaction the loans from the banks would have carried even lower interest rates. These alternatives didn't include any loans secured by real estate though Putanec valued his real estate at some $12.5 million.

Putanec maintains that the traditional financing alternatives didn't meet his desire to keep his Ariba shares, but we don't find this entirely credible. If Putanec followed myCFO's advice to liquidate $100 million of stock, then he would've had a large capital gain (nearly $100 million because the basis in his Ariba stock was negligible). The CARDS transaction was designed to generate a $100 million capital loss. So it seems that he planned to sell some stock anyway. Also, as he admitted, he knew that others in Silicon Valley had used margin loans to hold onto their stock holdings, but he was wary. He claimed that such alternatives were unattractive to him because margin loans allowed short sellers to get hold of stock

[*15] and sell it on the market, which might depress its value.[12]  In any event, he said that, none of the alternatives presented by myCFO were appealing to him.

A week after telling myCFO of his plans to go forward with the CARDS transaction, Putanec retained Brown & Wood as his "Special U.S. Federal Income Tax Counsel."  On December 15, 2000, Putanec signed a second engagement letter, this time with myCFO.  Putanec would pay myCFO and LeBoeuf Lamb $3 million (with $2,913,500 going to myCFO) to carry out the CARDS transaction.[13]  The planners structured the CARDS transaction to give Putanec a potential capital loss of $100 million to offset any gains from selling Ariba stock.  The 6% fee reflected the tax savings and thus totaled $6 million.

Chenery got a head start on the transaction by creating Morden Financial Trading, LLC, a Delaware LLC.  Morden entered into a credit agreement with

---

[12] Short selling is an investment technique that relies on the hope that a particular stock will fall in value.  A short seller borrows stock from the stockholder, agreeing to return the same number of shares at some point in the future.  He then sells the stock and takes the cash.  He must later buy the same amount of stock to make good on his loan.  If the price of the stock has fallen in the interim, he makes a profit.  See CNT Inv'rs, LLC v. Commissioner, 144 T.C. 161, 174 n.14 (2015).  The volatility of technology stocks makes many short sellers wary.  See Kathryn F. Staley, The Art of Short Selling 228 (1997) ("Many shorts avoid technology stocks like the plague because the normal trail signs do not usually apply").

[13] Chenery and myCFO had an arrangement where myCFO would receive 50% of any fees generated by referring clients to CARDS transactions.

[*16] Deutsche Bank despite not having any members, assets, or even an LLC agreement.  Pelham Olive signed the agreement on behalf of Morden.  Olive didn't have any authority to do so.  Deutsche Bank's outside attorney informed the bank that even though this was a clear default event, there wasn't any harm because the bank maintained control of the funds even after it made the loan to Morden.  The next day Chenery deposited funds into Morden's trust account with Deutsche Bank to cover the net interest charges should Chenery fail to find someone to assume the loan.

Within a week Morden had some members and even a manager.  Mio Sylvester, as Morden's new manager, signed the LLC agreement, the credit agreement with Deutsche Bank, and other corporate documents.  The LLC agreement restricted Morden's activities to those connected with the CARDS transaction and protected the bank's interest in the collateral.  All of Morden's members were U.K. citizens, and Morden's tax returns bore a U.K. address.

### 1. Loan Origination

Deutsche Bank loaned Morden €138,705,171 with a maturity of 30 years.  Morden received no actual cash from the loan.  It instead received two instruments:  a certificate of deposit of €117,959,304 (CD); and a promissory note with a face value of €20,745,867.  Deutsche Bank deposited the CD and note into

**[\*17]** a trust account for Morden in one of Deutsche Bank's subsidiaries, Bankers Trust Company. The trust account was the collateral for the loan.

The loan broke interest up into annual periods. The rate for the first period was 5.373%, and covered the period from November 21 to December 21, 2000. The second period was from December 22, 2000, to November 21, 2001, and was at a rate of 5.341%, computed as "Euribor" (LIBOR for deposits in euros) plus a spread. The credit agreement came with an important side letter--a promise from Deutsche Bank to renew the loan for each of the next six years (thus promising to continue the loan for up to a total of seven years). Deutsche Bank accepted the collateral though the side agreement made no mention of a promise to accept any other collateral in its place. Because the interest rate on the CD and note was 50 basis points below the rate on the loan, Morden would always need to pay more interest than it earned: The credit agreement was set up in a way that required either additional cash or additional collateral to pay the interest. Before Putanec assumed the loan, the situation between Deutsche Bank and Morden looked like this:

[*18]



Collateral:

CD = €118 million @ 4.873%
Promissory note = €21 million @ 4.873%

### 2. Loan Assumption

In December 2000 Putanec entered the picture. He agreed to assume the entire liability jointly and severally in exchange for the note on December 20, 2000. The agreement made Morden responsible for the interest payments, and Morden's collateral--at this point only the CD--would be used to pay the interest.

In the event that the interest from the CD wasn't enough to pay the interest on the entire loan (and it never would be), Putanec was required to post additional collateral to make up the shortfall. With each passing year, Putanec would need to post additional collateral as the CD was drawn down. At the end of 30 years--if the loan lasted that long--the CD would have been completely drawn down, leaving an outstanding loan balance of nearly €140 million (the full loan amount).

[*19] Morden and Putanec also both signed agreements that neither had a right of contribution from the other though, despite this provision, Deutsche Bank transferred funds from Morden's account to Putanec when the deal was ending. The assumption agreement also said that if Deutsche Bank let Morden withdraw or sell the CD, Putanec's liability would be reduced by the collateral released.

At first Putanec deposited the newly acquired note in an account with Bankers Trust. It was collateral, and he could redeem the note only if he posted replacement collateral approved by Deutsche Bank. Before Putanec redeemed anything, the situation between Putanec and Morden looked like this:



### 3. Operational Phase

Putanec wanted some actual cash in his hands. He got it by partially redeeming the note on three occasions. Because the note was denominated in euros, Putanec had to convert the euros to dollars, and that came with a catch: Deutsche Bank required Putanec to agree to an FX contract to convert the euros.

[*20] For Putanec this had the advantage of securing a price for paying the interest and the note value, as both would have to be paid in euros anyway.

Putanec curiously arranged the first redemption before he formally entered into the CARDS transaction. On December 15, 2000, Putanec asked Deutsche Bank to redeem part of the note and convert it to $532,352.68. Putanec entered into an FX contract that required him to pay $538,823.26 to convert the dollars back to euros. Thus, the FX contract on the first redemption cost Putanec $6,470.58, and was set as of the day of the redemption. Five days later, with Putanec finally in the ring, Deutsche Bank did as directed. The proceeds went into Putanec's account. Later, when he reported this transaction on his 2000 return, Putanec claimed that the partial redemption generated a more than $3 million loss --which just about offset his gain from his sale of 20,000 Ariba shares that year.

The second redemption came on January 2, 2001, and Deutsche Bank redeemed €8,421,052.63 of the note and converted it to $8 million. At the time of the conversion, Putanec agreed under a new FX contract to convert the dollars back to euros at a cost of $8,085,894.74. Thus, the second redemption had a built-in currency exchange cost of $85,894.74.

Putanec redeemed the remainder of the note on August 22, 2001, for €11,736,579.37. He didn't convert the euros to dollars, as he testified that the last

[*21] redemption "was done purely from [his] understanding of what the tax benefits and non-benefits of doing [it] were."[14] But into the Bankers Trust account those funds went too. Putanec paid a total of $92,365.32 for the FX contracts to convert the euros to dollars and then the dollars to euros. This also eliminated his foreign-currency risk.

To get this cash, though, Putanec had to post new collateral satisfactory to Deutsche Bank. Before Putanec entered into the transaction, Deutsche Bank had established a collateral limit of 1.5 million Ariba shares. Putanec first put 200,000 Ariba shares in his account as collateral. In January 2001 Putanec deposited an additional 750,000 shares (at the time worth about $30 million). Deutsche Bank required the additional collateral for Putanec to get access to the $8 million from the second note redemption. On January 11, 2001, Putanec deposited an additional 100,000 shares in the account, which meant he had deposited a total of 1,050,000 shares in the account.

Remember that the beginning of 2001 was also the beginning of the end for the tech boom. By February, because of the continuing decline in Ariba's share price, Deutsche Bank demanded additional collateral. Instead of depositing more

---

[14] Putanec was admirably honest with this admission. At trial he even said the last redemption was done in order to get the loss so that he could "take [his] aggressive tax position * * * ."

[*22] stock, Putanec sold some of his Ariba shares--which realized capital gains nearly equal to the sale price because of Putanec's ultralow basis in his shares-- and bought bonds from the Federal Farm Credit Bank and the Federal Home Loan Bank.  These bonds had a total face value of just over $12.5 million.  Once he deposited them, Putanec withdrew the million or so Ariba shares from the trust account.  The redemptions by Putanec on the note looked something like this:



Loan €139 million @ 5.373%

Putanec

Deutsche Bank

Redemptions:

12/21/2000: $532,353
1/3/2001: $8,000,000
8/22/2001: Balance (€11,736,579
not converted to U.S. dollars)

Collateral: Deposits of Ariba stock

1/2/2000: 200,000 shares
1/4/2001: 750,000 shares
1/11/2001: 100,000 shares

Collateral: Bank bonds

Federal Farm Credit Bank: $9,430,000
Federal Home Loan Bank: $3,150,000

[*23] These redemptions had a beneficial tax effect. They produced a reported loss of more than $100 million, which more than offset the gains Putanec realized from the almost-forced sale of about 3 million Ariba shares throughout 2001 plus the gain from call options on Ariba stock that he had had the foresight to sell.

III.    The Aftermath

Following the CARDS transaction Putanec had access to about $8.5 million (and had paid over $6 million in fees to get it). Putanec used most of it ($7.3 million) to buy real estate in New York City and San Francisco. He used the remaining $1.2 million to pay a capital call on another investment. The real estate in New York City was a condominium for which Putanec had already contracted before he formally entered the CARDS deal. The New York City property was listed as a personal asset, and he claimed an itemized deduction for property taxes on his return. Putanec later sold the New York City property for a profit. Putanec also bought a property in San Francisco and listed it as his home address on his returns. He testified that his parents live in the California property.

Deutsche Bank terminated the loan on November 21, 2001. This meant that Putanec was liable for the first year's interest on the loan. The Bank concluded that Putanec was liable for just over €22 million, which it computed by adding the principal and interest due on the Morden loan and then subtracting the value of

[*24] Morden's CD and the interest owed on it. The third note redemption of €11 million took care of much of that, and Putanec ended up paying an additional $1 million or so after accounting for the remaining funds in Morden's and his Bankers Trust accounts. In total, then, Putanec's net cost for entering into the CARDS transaction, including the initial $6 million upfront fee, amounted to just over $7 million. And all this to get just about $8.5 million in cash.

Putanec took the position that his basis in the note was the full value of the loan, and thus when he redeemed it and received a total amount equal to its face value rather than its much higher alleged basis, there was a large capital loss.

The Commissioner examined Putanec's 2000, 2001, and 2006 tax returns, and denied the capital losses and FX contract losses associated with the CARDS transaction. We tried the cases in San Francisco.

There are two issues for us to decide.[15] First is the big issue: whether Putanec is entitled to his claimed loss from redemption of the note, to the order of $112 million in capital losses. The second issue is what to do about the "losses"

---

[15] Putanec and his wife were California residents when they filed their petition, which makes these cases appealable to the Ninth Circuit. We therefore follow that court's precedents. See, e.g., Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971).

[*25] on the FX contracts that were associated with the CARDS transaction. We take them in turn.

OPINION

I.     The Note and the Loss

Putanec asks us to go along with his claim that there's nothing amiss in acquiring a €20,745,867 note at a cost of €138,705,171. He urges us to fall under the spell of this tax wizardry by citing specific sections of the Code and regulations that seem to justify his claimed basis.

A.     Arguments of the Parties

As a preliminary matter, Putanec reiterates several times that the CARDS transaction was "uniquely attractive" for three reasons: (1) the loan allowed him to take cash value out of his Ariba stock without selling it; (2) he didn't have to pay interest during the course of the loan; and (3) the CARDS deal didn't give traders access to the Ariba shares to sell short. He flatly states that he didn't enter into the CARDS deal for tax reasons.

But on to why Putanec believes his basis in the note should equal the entire amount of the loan. As a general matter, the consideration paid usually determines a taxpayer's basis in a capital asset such as the note. Section 1011 directs us that the basis to be used to determine gain or loss from a sale or other disposition of

**[*26]** property should be determined under section 1012.  Section 1012 equates

basis with the cost of the property.  A liability that an asset's buyer assumes is

included in the total cost of acquiring property.  Wash. Mut. Inc. v. United States,

636 F.3d 1207, 1217 (9th Cir. 2011).[16]

Putanec's initial position is that, because he assumed liability on the entire

loan as a cost of receiving the note, his basis in the note must equal the entire

amount of the loan.  One problem is that Morden is also liable for the entire

amount of the loan, so maybe Putanec didn't *really* assume the liability.  But

Putanec has an answer to that--regulation section 1.1001-2(a)(4)(ii).  That

regulation tells us that "[t]he sale or other disposition of property that secures a

recourse liability discharges the transferor from the liability if another person

agrees to pay the liability (whether or not the transferor is in fact released from

liability)."  Id.  So, under the regulations, Morden *is* discharged from the debt for

tax purposes (and that's in fact the position Morden took on its own return).

Putanec agreed to pay the liability, so he should be treated as having the full

---

[16] A simple example of this occurs when someone sells his house and the buyer assumes the mortgage.  If the property is worth $500,000 and has a $350,000 mortgage, the buyer could pay $150,000 and assume the responsibility of paying the mortgage.  When he does, his basis isn't limited to the cash he paid, but equals $500,000--the $150,000 cash plus the $350,000 liability he took off the seller's hands.

[*27] liability included in his cost of acquiring the note. The regulation, Putanec argues, ensures there isn't double counting of the entire debt in the bases of both Morden and himself.

The Commissioner disagrees. He has a number of theories for why Putanec's basis is equal to the note's face value and not the entire value of the loan:

- Putanec's debt was not genuine;

- his debt was contingent;

- the CD was to be used to pay part of the loan;

- basis should be limited to its fair market value under the "peculiar circumstances" of these cases; and

- basis must be apportioned between the note and the CD.

B.      Putanec's Basis in the Note

We'll start with a question: Was the loan here real debt? For Putanec's reading of section 1.1001-2(a)(4)(ii) of the regulations to apply here we have to figure out what "liability" to apply it to. We focus on the nature of the loan debt and Putanec's relationship with Morden as codebtor.

While it is true that assumption of debt is taken into account when establishing basis, not all debt will go into the "cost" of acquisition--and

**[*28]** consequently it won't go into the basis of the property acquired. As we noted in <u>Corbin W. Ltd. P'ship v. Commissioner</u>, T.C. Memo. 1999-7, 1999 WL 13704, at *3: "In deciding whether a recourse note is included in basis, the mere fact that the note is recourse on its face, however, is not determinative. * * * When taking economic realities into account, if a recourse debt has no reasonable likelihood of being paid, then the recourse note lacks economic substance and should not be included in basis." To determine if a debt is likely to be paid, we have to take into account all the facts and circumstances. <u>Waddell v. Commissioner</u>, 86 T.C. 848, 903 (1986), <u>aff'd</u>, 841 F.2d 264 (9th Cir. 1988). In <u>Waddell</u> we confronted a situation where we found it unlikely that a purchase money note would be paid, because the note there was convertible into being nonrecourse and payment of principal was limited to revenues. This made payment of the note unlikely. There was something analogous here.

One particular fact stands out to us: 85% of the loan amount was secured and adequately collateralized by the CD, not the note. <u>See</u> <u>Bridges v. Commissioner</u>, 39 T.C. 1064, 1077 (1963), <u>aff'd</u>, 325 F.2d 180 (4th Cir. 1963) (even where the lender had recourse to go after the debtor, there was no reason to believe that the debtor would actually be called upon to pay the bank because the bank was amply secured without any additional payment). Here, the loan can be

**[*29]** looked at as a whole, or broken up into two parts--one secured by the CD (and gradually decreasing in value), and one secured by the note (with Putanec needing to gradually post more collateral as the CD is drawn down).

We also focus our attention on the time Putanec entered the deal. Basis is determined at the time of acquisition. See sec. 1011(a) ("The adjusted basis * * * of property, *whenever acquired*, shall be the basis [under section 1012]." (Emphasis added)). From Putanec's perspective at the time he acquired the note, the only way that he would actually repay the entire loan would be if it remained outstanding for a large portion of the 30-year term. We find that thirty years was not the likely term of the loan: Deutsche Bank committed to renewing the loan annually for only seven years, not thirty. Bill Boyle, vice president in Deutsche Bank's Structured Transactions Group, explained to colleagues that "effectively, [Deutsche Bank has] the ability to exit the transaction after one year * * * ." Putanec's own interest in the deal was to realize a paper loss on disposition of the note, and there is nothing in the record that shows he had any interest in being on the hook for more than $100 million thirty years later. We therefore find that no party to the transaction expected the deal to extend anywhere near that long into the future. We therefore also find that when Putanec acquired the note he was not likely to repay the portion of the loan secured by the CD, because it was so

**[*30]** extremely unlikely that the loan would continue for very long at all. If Putanec was unlikely to have to repay the loan debt, then it's hard to see how any amount of that debt in excess of the value of the note could be his "liability."

We recognize that "extremely unlikely" is not the same as "never". Let us assume there is some small probability the loan would last longer than any of the parties expected. This still wouldn't help Putanec. As we held many years ago in Albany Car Wheel Co. v. Commissioner, 40 T.C. 831 (1963), aff'd, 333 F.2d 653 (2d Cir. 1964), the general rule is that a contingent liability assumed as a part of an acquisition may not be added to the basis of the acquired property. Id. at 839. Another way of looking at this question is whether the portion of the loan secured by the CD was "contingent" from Putanec's perspective. At the beginning of the CARDS deal he signed on to be liable for a loan with a thirty-year maturity date, but Morden remained liable. Morden's asset, the CD held in its Banker's Trust account, was sufficient in year one to pay off around 85% of the loan amount, and Morden could do so by prepaying the loan without penalty. The only way that Putanec would ultimately be liable for the entire loan amount was if the loan had remained outstanding for the full thirty years--something we have found no one expected to happen. And he'd be liable for any portion of the loan not secured by

**[*31]** the note only years down the line. We find that this makes the portion of the loan secured by the CD "contingent."

There is good reason for such a rule on contingent liabilities. Refusing to include contingent liabilities in basis as a general rule doesn't prevent liabilities from ever being included in basis. In the unlikely event that the loan had gone on for thirty years, Putanec would have been able to include that amount in his basis-- but only when the contingency occurred. See generally Brountas v. Commissioner, 692 F.2d 152, 158 (1st Cir. 1982) ("If [the contingency] does not occur, the obligations need never enter basis, for they do not represent any obligation to pay. If it does occur, the extent of the monetary obligation will be reasonably capable of calculation, and any change in basis * * * can then be determined"), vacating 73 T.C. 491 (1979). And as the Commissioner correctly notes: "Petitioner's liability to repay any portion of the Morden Loan secured by the CD did not begin to arise until the CD had to be tapped to pay an interest shortfall." We are thus satisfied that the portion of the loan secured by the CD was a contingent liability to Putanec. Only that part of the loan which was no longer secured by the CD (as a result of drawing down the CD to service the interest) after the limited duration of the CARDS deal is properly included in Putanec's basis. When the bank terminated the loan in November 2001, Putanec

[*32] was liable for one year's worth of the interest, and this liability was no longer contingent. We leave to the parties' Rule 155 computations whether any of this means an increase in his basis beyond the face value of the note.

## II.   The FX Contracts

Putanec also wants to deduct $92,365.32--the total amount he paid to enter into the two FX contracts with Deutsche Bank. This requires us to look at sections 988 and 1256.

Under section 988(a), if a foreign-currency transaction qualifies as a "forward contract" the entire loss may be capital and not ordinary if a taxpayer makes the proper election. The problem for Putanec is that section 988 doesn't apply to "personal transaction[s]." See sec. 988(e)(1). "Personal transactions" are all transactions that don't fall under sections 162 (business transactions) and 212 (transactions entered into for the production of income). Sec. 988(e)(3). We find against Putanec on this question. There was no business to speak of, and he didn't enter into the FX contracts for the production of income. He entered into them only to facilitate the CARDS transaction, and that transaction ended up costing him over $7 million over the course of the deal. The price of the contracts was set at the time of their signing with a built-in loss. We can find no profit motive in these circumstances.

[*33] That puts the contracts in section 1256 territory. Under section 1256, an FX contract is "marked to market" at the end of every year, and the taxpayer recognizes gain or loss as if the contract had been sold for its fair market value. If the contract extends over many years, each year the taxpayer recognizes gain or loss as the fair market value of the contract goes up or down. And, crucially for Putanec, section 1256 does not have any exception to its applicability for anything like "personal transactions." See generally Summitt v. Commissioner, 134 T.C. 248 (2010) (discussing the evolution of section 1256 and interpreting the phrase "foreign currency contract"); see also Wright v. Commissioner, 809 F.3d 877 (6th Cir. 2016), rev'g and remanding T.C. Memo. 2014-175 and T.C. Memo. 2011-292. The contracts qualify under the definition of "foreign currency contract" in section 1256(g)(2)(A): Putanec entered into them at arm's length with Deutsche Bank (a commercial bank), and the euro was traded through regulated futures contracts during 2000 and 2001 (the years in which the contracts were in effect). Since the contracts fall under the mark-to-market rules, the losses are treated as 40% short-term capital losses and 60% long-term capital losses. See sec. 1256(a)(3).

**[*34]** III.    <u>Conclusion</u>

Boris Putanec entered into a complicated and carefully structured CARDS transaction that he hoped would bring to life more than $100 million in losses. We can't grant him his wish. The deal is the stuff of tax wizardry, while the Code treats us all as mere muggles. The loan he assumed wasn't all genuine debt, and any potential obligation he had to repay the entire loan was unlikely or at best contingent. As a result, we find that only those portions of the loan secured by the Deutsche Bank note, as well as any amount which corresponded to the drawing-down of the Deutsche Bank CD for which Putanec would have to post more collateral, are his real basis in the note. Thus, the claimed losses relating to the CARDS deal aren't allowed. The small solace to Putanec is his deductions for the FX contract costs, which are allowed for the full amounts.

<u>Decisions will be entered</u>

<u>under Rule 155</u>.